No.  91-476
and  91-508

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

---

JAMES LEWIS AND THERESA SATHER,

> Relators, Petitioners
> and Appellants,

-vs-

CATHOLIC SOCIAL SERVICES FOR MONTANA,

> Respondents and Respondents.

---

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Jeffrey Sherlock, Judge presiding.


COUNSEL OF RECORD:

> For Relators/Appellants:
>
> > Linda  J.  Garofola  and  David  K.W.  Wilson,  Jr.;
> > Reynolds,  Motl,  Sherwood  &  Wright,  Helena,  Montana
>
> For Respondents:
>
> > William P. Driscoll and Michael S. Lattier; Gough,
> > Shanahan, Johnson & Waterman, Helena, Montana

FILED

MAY 21 1992

Filed
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted on Briefs:  December 19, 1991

Decided:  May 21, 1992

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order of the First Judicial District, Lewis and Clark County, denying petitioners' request for a preliminary injunction. Inasmuch as the issues are the same in relators' petition for supervisory control, the petition for supervisory control is hereby dismissed.

We frame the issue as follows: Whether the District Court erred in determining § 40-8-108, MCA (1991), barred the foster parents from contesting the placement for adoption decision of the agency having custody and barred the foster parents' petition for adoption.

On March 29, 1989, the custody of Baby Girl W. was granted to Catholic Social Services for Montana (CSS) for placement and ultimate adoption. The birth mother had informed CSS that she wished to keep the child away from the birth father out of fear for herself and the child. She related that in the past the birth father had been abusive to her and an older child. The birth mother did not want the father to know the whereabouts of the child. CSS assured the birth mother the child would be placed in a safe home where the father would not find her. On March 30, 1989, CSS placed Baby Girl W. with the relators, James Lewis and Theresa Sather, as foster parents. This was the first foster child for the Lewises. The Lewises signed an agreement stating they would not attempt to adopt the child placed in their care. The Lewises were also told of the assurances given to the birth mother that the child would be placed out of state away from the father.

2

This was reiterated to the Lewises from time to time.

Initially, CSS told the Lewises that Baby Girl W. would be in their care only a short while. Having previously obtained a consent for termination of parental rights from the birth mother, the District Court in a lengthy contested action by the birth father, terminated the parental rights of the birth mother and the birth father, granted legal custody to CSS and granted it the right to consent to Baby Girl W.'s adoption. The birth father appealed this decision to this Court. We affirmed the District Court's decision on July 2, 1991. In the Matter of the Parental Rights of Baby Girl W. (1991), 249 Mont. 206, 814 P.2d 976. Because of the delay in making a final termination of parental rights, Baby Girl W. remained with the Lewises for 27 months. During this time the Lewises began to regard Baby Girl W. as their own and vocalized their wish to adopt the child.

CSS's plan had always been to place Baby Girl W. for adoption with a family other than the foster family. CSS did not in any way raise the expectations of the Lewises that they would be able to adopt the child. Subsequent to this Court's decision on July 15, 1991, a meeting occurred between Marilyn McKibben, director of CSS, and the Lewises to discuss Baby Girl W.'s future. Although the Lewises requested CSS's attorney to set up a meeting to discuss their adoption of Baby Girl W., Marilyn McKibben indicated she was not interested in meeting with the attorneys.

At the July 15, 1991 meeting, CSS indicated they would be removing Baby Girl W. from the Lewises' home in the next day or so.

3

The Lewises cooperated with CSS in order not to hurt their chances of adopting Baby Girl W. and immediately took steps to retain legal counsel for that end. On July 17, 1991, Baby Girl W. was removed from the Lewises' home. On August 2, 1991, CSS placed Baby Girl W. out of state with a potential adoptive family.

There is no dispute that the Lewises provided a safe, stable and nurturing home for Baby Girl W. and that, under normal circumstances, they would be eligible adoptive parents. This is an emotionally difficult case for all involved. The District Court in its ruling found that under § 40-8-108, MCA, only the parties designated could place the child for adoption. The court reasoned that since CSS did not consent to the Lewises' request for adoption, and had not placed the child for adoption in Montana, the Lewises could not adopt Baby Girl W.

The District Court found that there was evidence in the record that the father was a danger to the birth mother and the child, and that such evidence would be of reasonable concern on the part of CSS. The District Court further found that CSS is an experienced adoption agency and the court gave deference as to its view of the seriousness of any threat that might be posed by the birth father. Based on the above, the court further found that it would then be unable to say that the actions of CSS in placing the child out of state were unreasonable or that refusal by CSS to give consent to the petitioners was unreasonable.

The District Court was also of the view that granting relief to the petitioners could have a broader policy impact on the entire

4

adoption process in Montana. Adoption agencies would be fearful of placing children in foster homes if they were not reasonably certain that they could place a child with the family of their choice. Primarily the court, as stated above, based its decision on the wording of § 40-8-108, MCA, and denied the preliminary injunction, dismissed the case and entered judgment accordingly.

The District Court found that § 40-8-108, MCA, was a bar to the Lewises' petition for adoption of Baby Girl W. The statute provides:

> A child may be placed for adoption only by: (1) the department; (2) a licensed child placing agency; or (3) the child's parents.

Placement is defined in § 40-8-103 (11), MCA (1991) as: "...the transfer of physical custody of a child with respect to whom all parental rights have been terminated and who is otherwise legally free for adoption to a person who intends to adopt the child." There is no case law interpreting these sections of our statute. We agree with the District Court that in the instant case procedurally, under § 40-8-108, MCA, only CSS may place Baby Girl W. for adoption.

Section 40-8-108, MCA restricts who may place a child for adoption and does not include courts in its list of who may place a child for adoption. Therefore it is clear that the courts could not place Baby Girl W. with the Lewises. No dispute exists that CSS has placed Baby Girl W. for adoption.

The wording of the Montana act itself and the public policy of discouraging black market adoptions and private adoptions argue

5

against judicial review of placement decisions. Montana, along with five other states, adopted the Uniform Adoption Act (UAA). According to Adoption Law and Practice, Joan H. Hollinger, the act attempts to discourage black market adoptions and private adoptions. See, pp. 4A-3 (1989). Neither §§ 40-8-103 (11) nor 40-8-108, MCA, are part of the UAA. However, legislative minutes to the 1981 revision of Montana's adoption law indicate that § 40-8-108, MCA, was enacted out of concern for the black market problem. Additionally, legislative minutes to the 1989 amendment of § 40-8-121, MCA, which designates the steps in filing a petition for adoption, suggest the amendment was enacted due to perceived problems with private placement. An example of Montana's concern with private placements would be the elaborate framework set forth in § 40-8-109, MCA (1991), regulating private placements. Under the statute parents who wish to have their child adopted by non-relatives must give notice to the authorities of their intent and must follow the numerous requirements of the statute prior to private placement.

Cases exist from other jurisdictions which address an agency's refusal to consent to adoption of a child that has already been placed in a prospective adoptive home; the usual standard of review in such cases is arbitrary and capricious. That is not the exact question here. Homer H. Clark, Jr., in his treatise, The Law of Domestic Relations in the United States, 2nd ed. vol. 2, 615, 651, (1988), suggests that theoretically, an agency's refusal to place a child with prospective adoptive parents may be reviewable under

6

the same standard as the denial of a consent to an adoption. Even if we considered whether or not the placement by CSS was subject to review because of arbitrariness or capriciousness under the facts of this case, it would not change the result. The District Court in its findings, after viewing all the evidence, did not find the actions of CSS in placing the child out of state as unreasonable or refusal by CSS to give consent to the petitioners as unreasonable.

In view of the District Court's findings and conclusions that based on the evidence and record, it was unable to say that the actions of CSS in placing the child out of state was unreasonable or that CSS's refusal to give consent to adoption by the Lewises was unreasonable, the District Court could not in any case determine the actions of CSS to be arbitrary and capricious. We cannot say the court was erroneous or abused its discretion in making such findings, conclusions, and final decision. We therefore affirm the District Court.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

7

Justice Terry N. Trieweiler dissenting.

I dissent from the opinion of the majority. The issue in this case is not who may place Baby Girl W for adoption. Catholic Social Services for Montana (hereinafter CSSM) clearly has that authority and intends to exercise it. The issue is whether, in the exercise of its placement authority, CSSM can arbitrarily refuse to consider the foster parents, even if to do so would be contrary to Baby Girl W's best interests. I believe this situation is analogous to statutes which require agency consent to adoption. There is considerable authority that such consent cannot be arbitrarily withheld.

In *In re McKenzie* (Minn. 1936), 266 N.W. 746, a juvenile located in Minnesota had been placed by court order under the care of the Minnesota Board of Control. That board placed the same child with foster parents where the child remained for over three years. After the child was removed from the foster parents' home to an orphanage, they petitioned for adoption. The board refused based on a religious difference between the child and the proposed adoptive parents.

Minnesota had a statute which prohibited adoption without the consent of the parents, the guardian, or the State Board of Control. The Minnesota Supreme Court was called upon to decide whether consent could be unreasonably withheld when an adoption appeared to be in the child's best interests. It concluded that it

8

could not. In discussing the board's rule on religious compatibility, the Minnesota Supreme Court stated:

> In so far as the operation of the rule is not inimical to the best interests of the child, the board may be justified in not consenting to the placing of the children with adoptive parents of a different faith, but to blindly follow such a rule after placing the child for support with a well-qualified family for a period so protracted that a strong affection for the child is permitted to develop is, in our view, unreasonable. The affection of foster or adoptive parents is the child's greatest asset in life. It usually means a good education and a start in life. Where, as here found by the trial court, it is accompanied by character building surroundings and complete religious tolerance, and the chances of matching the surroundings and affection elsewhere are slight, the board's action becomes so unreasonable as to fall within the definition of caprice.

*McKenzie*, 266 N.W. at 748.

In the case of *In re Adoption of Daughtridge* (N.C. 1975), 212 S.E.2d 519, the Court of Appeals of North Carolina was called upon to decide whether a county department of social services could withhold consent to adoption under similar circumstances. That court held:

> We agree with the Minnesota court that that consent may not be unreasonably and unjustly withheld. If the court shall find that a failure to grant the petition for adoption would be inimical to the best interests and welfare of the child, it may proceed as if the consent which it finds ought to have been given has been given.

*Daughtridge*, 212 S.E.2d at 524.

Other courts have arrived at similar conclusions. *See State ex rel. Dept. of Institutions Social and Rehabilitative Services v. Griffis* (Okla. 1975), 545 P.2d

9

763; *Oxendine v. Catawba County Department of Social Services* (N.C. 1981), 281 S.E.2d 370.

This Court has previously indicated that it is in accord with those decisions. *Frederick v. District Court* (1946), 119 Mont. 143, 173 P.2d 626.

The effect of § 40-8-108, MCA, which limits who may place a child for adoption, is no different than the effect of the statutes referred to in these cases which limit who could consent to the adoption of a child. By deciding in these cases that consent could not be arbitrarily and unreasonably withheld, these courts did not substitute themselves for the consenting agency anymore than this Court would by concluding that placement for adoption could not be arbitrarily or unreasonably denied. Therefore, based on precedent and logic, the majority opinion makes no sense to me when it concludes that:

> Section 40-8-108, MCA restricts who may place a child for adoption and does not include courts in its list of who may place a child for adoption. Therefore it is clear that the courts could not place Baby Girl W. with the Lewises. No dispute exists that CSS has placed Baby Girl W. for adoption.

The majority concedes that an agency's refusal to place a child with prospective adoptive parents may be reviewable to determine if that refusal was arbitrary and capricious. However, the majority then goes on to conclude that even if that standard is adopted, the District Court must be affirmed because it found that CSSM's refusal was not unreasonable. The problem with the

10

majority's reasoning and the District Court's decision is that a finding of reasonableness cannot be made without a determination of Baby Girl W's best interests, and no such determination was made in this case because of the District Court's erroneous conclusion that § 40-8-108, MCA, prevented it from granting the relators' petition.

The petitioners in this case received custody of the child (hereinafter referred to as Natasha) from CSSM on March 30, 1989. They signed the written contract referred to in the majority opinion based upon CSSM's representation that Natasha would remain with the parties for three months. However, by the time she was removed from their home, she had lived with them for 27 months; she had become, for all practical purposes, a member of their family; and she had developed a close personal bond and relationship with all members of the family.

According to the District Court's findings:

> There is no dispute that Petitioners are very attached to Natasha, and that she has become attached to Petitioners and their three children. Further, it is absolutely clear to this Court that Petitioners provided a safe and nurturing home for Natasha. It is clear that Petitioners would be excellent adoptive parents.

The only qualified psychologist to testify on behalf of either party in the District Court was Dr. Mark Mozer, a clinical psychologist from Helena. His testimony was summarized by the District Court as follows:

> Dr. Mozer indicated that Petitioners are wonderful parents and were closely bonded with Natasha. He testified that, in his view, the risk of harming Natasha by moving her to California at this stage of the

11

proceedings is great. He feels that the bond between Petitioners and Natasha is great and that moving her to California can cause that bond to be broken and cause severe problems with her in the future.

Section 40-8-114, MCA, sets forth the paramount public policy consideration of the Uniform Adoption Act. It provides in relevant part that:

(1) It is the policy of the state of Montana to ensure that the best interests of the child are met by adoption proceedings.

(2) The primary purpose of adoption is to help a child become a permanent member of a nurturing family that can give him the care, protection, and opportunities essential for his healthy personal growth and development.

(3) The well-being of the adopted child is the main objective in the placement of children for adoption. The needs of the child must be the primary focus of adoption proceedings, with full recognition of the interdependent needs and interests of birth parents and adoptive parents.

It is clear that the District Court did not get to the point of making the necessary findings in this case because it misapplied § 40-8-108, MCA. The District Court concluded:

In the first place, Section 40-8-108, MCA, provides as follows: "A child may be placed for adoption only by: the department; a licensed child placing agency; or the child's parents." This provision is unique to Montana law. This Court has not found any cases interpreting this section but it seems to say that an adoption proceeding cannot begin until one of the parties designated in Section 40-8-108 (here CSSM) places the child for adoption. Since CSSM has not placed Natasha for adoption in Montana, it appears that Petitioners' argument must fail.

. . . .

12

Primarily, however, this Court relies on Section 40-8-108, MCA. This section provides that a child can only be placed for adoption by an agency. Thus, since Natasha has not been placed for adoption in the State of Montana by CSSM, Petitioners must fail.

Why it made any difference to the District Court where Natasha was placed for adoption by CSSM is not clear. However, it is clear that she has been placed for adoption. It is equally clear that the provision relied on by the District Court was, as pointed out by the majority, merely for the purpose of limiting black market placement of children for adoption and does not divest this Court of authority to review placement decisions to assure that they are made in the child's best interest.

Without deciding what was in Natasha's best interest, the District Court could not decide whether the adoption agency's consent was withheld arbitrarily and capriciously. I would conclude that any actions taken by CSSM which were for its own benefit or based on a contract with the foster parents which was entered into under these circumstances, rather than solely for the best interests of Natasha, was unreasonable, arbitrary, and capricious.

I would reverse the District Court and remand this case for further findings regarding the child's best interests and placement for adoption that will serve those interests.

Justice

13

May 21, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Linda J. Garofola and David K.W. Wilson, Jr.
REYNOLDS, MOTL, SHERWOOD & WRIGHT
405 N. Last Chance Gulch
Helena, MT 59601

William P. Driscoll
GOUGH, SHANAHAN, JOHNSON and WATERMAN
P.O. Box 1715
Helena, MT 59624

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _Holliday_
Deputy